# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

EITAN KONSTANTINO,                                )
                                                  )
      Plaintiff/Counterclaim                    )
      Defendant,                                )
                                                  )
    v.                                            )    C.A. No. 9681-CB
                                                  )
ANGIOSCORE, INC.,                                 )
                                                  )
      Defendant/Counterclaim                    )
      Plaintiff/Third-Party Plaintiff,          )
                                                  )
    v.                                            )
                                                  )
QUATTRO VASCULAR PTE LTD.,                        )
QT VASCULAR LTD., TRIREME                         )
MEDICAL, LLC, TRIREME MEDICAL                     )
(SINGAPORE) PTE, LTD., and the GROUP,             )
                                                  )
      Third-Party Defendants.                   )

## MEMORANDUM OPINION

Date Submitted: July 27, 2015
Date Decided:  October 2, 2015
Date Revised:  October 9, 2015

Ian R. Liston and Tamika R. Montgomery, WILSON SONSINI GOODRICH & ROSATI, PC, Wilmington, Delaware; *Attorneys for Plaintiff, Counterclaim Defendant Eitan Konstantino*.

William D. Johnston, Kathaleen St. J. McCormick, Elisabeth S. Bradley and Matthew C. Bloom, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Kenneth H. Frenchman, KASOWITZ BENSON TORRES & FRIEDMAN, LLP, New York, New York; *Attorneys for Defendant, Counterclaim Plaintiff, and Third-Party Plaintiff AngioScore, Inc*.

Patricia L. Enerio and Melissa N. Donimirski, PROCTOR HEYMAN ENERIO LLP, Wilmington, Delaware; *Attorneys for Third-Party Defendants Quattro Vascular Pte Ltd., QT Vascular Ltd., TriReme Medical, LLC and TriReme Medical (Singapore) Pte Ltd.*

**BOUCHARD, C.**

This action involves claims for advancement and contribution for legal fees and expenses relating to a federal lawsuit in which Dr. Eitan Konstantino was sued for usurping a corporate opportunity of AngioScore, Inc. when he created a balloon catheter device (known as the Chocolate device) for the benefit of a competitor he had formed (TriReme Medical, Inc.) while serving as a director of AngioScore.

In May 2014, Konstantino filed this action seeking advancement from AngioScore to defend against certain claims in the federal action. In August 2014, the Court granted summary judgment in Konstantino's favor ordering advancement from AngioScore. In response to the filing of this action, AngioScore asserted third-party claims for contribution and tortious interference with contract against four entities that make up the corporate family that presently manufactures and sells the Chocolate device. One of these entities is a Delaware limited liability company. The other three entities were incorporated in Singapore.

In this motion, the Singapore entities seek dismissal for lack of personal jurisdiction, and all third-party defendants seek dismissal of the claims asserted against them for failure to state a claim for relief. For the reasons explained below, I conclude that AngioScore has made a *prima facie* showing that this Court has personal jurisdiction over the Singapore entities under the conspiracy theory of jurisdiction. I also conclude that AngioScore has stated a claim for contribution (and for related declaratory relief), but has not stated a claim for tortious interference with contract.

1

## I.  BACKGROUND[1]

### A.  The Parties

Plaintiff Dr. Eitan Konstantino was one of the founders of Angioscore. Konstantino served as an officer of AngioScore from its formation in 2003 until March 31, 2007, and as a director of AngioScore from 2003 until February 5, 2010.

AngioScore is a Delaware corporation. It develops, manufactures, and markets the AngioSculpt Scoring Balloon Catheter ("AngioSculpt") for both the coronary and peripheral interventional markets. Konstantino was the principal inventor of AngioSculpt. On June 30, 2014, Spectranetics Corporation, a publicly-traded company, acquired AngioScore.

The third-party defendants are four entities Konstantino formed to develop and manufacture various medical devices, including balloon angioplasty catheters to be sold in the United States in competition with AngioScore. TriReme Medical, LLC ("TriReme") is a Delaware limited liability company with its headquarters in Pleasanton, California. Quattro Vascular Pte Ltd. ("Quattro"), TriReme Medical (Singapore) Pte Ltd. ("TriReme Singapore") and QT Vascular Ltd. ("QT") are each incorporated in Singapore. These three entities are sometimes referred to below as the "Singapore entities," and together with TriReme, as the "Third-Party Defendants."

---

[1] Unless noted otherwise, the facts recited in this opinion are based on the allegations of the First Amended Verified Counterclaims and Third-Party Claims (the "Amended Third-Party Complaint" or "Am. Third-Party Compl.").

2

**B.      The Formation and Reorganization of the Third-Party Defendants**

In May 2005, while he was an AngioScore employee, Konstantino formed TriReme Medical, Inc., a Delaware corporation, which was the predecessor entity to TriReme. In 2009, after he ceased to be an employee of AngioScore but while still serving as an AngioScore director, Konstantino founded an entity called Proteus, which was the predecessor to Quattro. The three Singapore entities were incorporated after Konstantino ceased to be a director of AngioScore in February 2010, as follows: Quattro (March 2010), TriReme Singapore (December 2010), and QT (2013).[2]

In 2011, TriReme received FDA approval to market the Chocolate PTA Balloon Catheter (the "Chocolate device"), a competitor device to AngioSculpt. TriReme has marketed the Chocolate device for sale in parts of the United States, and has sold the Chocolate device to two hospitals in Delaware.

On July 11, 2013, TriReme Medical, Inc. converted from a Delaware corporation to a Delaware limited liability company to become TriReme by filing a certificate of conversion with the Delaware Secretary of State. Also on July 11, 2013, TriReme transferred all of its holdings in Quattro and TriReme Singapore to QT under a Master Reorganization Agreement (the "Reorganization Agreement"). As a result of the reorganization, QT became the parent of the other three Third-Party Defendants, owning

---

[2] AngioScore alleges in paragraph 12 of the Amended Third-Party Complaint that Quattro was founded in late 2009 and incorporated in Singapore in March 2010. I construe this paragraph to mean that the predecessor of Quattro (Proteus) was founded in 2009, and that Quattro in its current form was not incorporated until March 2010. *See* Tr. of Oral Arg. 65, 83-84 (July 27, 2015); *see also AngioScore, Inc. v. TriReme Medical, Inc.*, 2015 WL 4040388 (N.D. Cal. July 1, 2015) at *22-23.

100% of each of TriReme, TriReme Singapore, and Quattro. Section 3 of the Reorganization Agreement states that "[TriReme] will transfer the beneficial ownership free from all encumbrances of all its assets as of 11 July 2013 to [TriReme Singapore] and [TriReme Singapore] will undertake all liabilities of [TriReme] as [sic] 11 July 2013, which particulars are set out in the Schedule."[3]

### C.     AngioScore Sues Konstantino in California

In July 2012, AngioScore filed a patent infringement action in the United States District Court for the Northern District of California (the "Federal Action"), alleging that Konstantino, as an officer and director of each of TriReme and Quattro, developed and sold the Chocolate device and that the device infringed AngioScore's patents.

On May 6, 2014, AngioScore sought leave to amend its complaint in the Federal Action to assert various state law claims against Konstantino. On May 15, 2014, AngioScore filed a complaint in Superior Court in California, seeking a judicial declaration that AngioScore is not required to indemnify Konstantino for the state law claims AngioScore was seeking leave to assert in the Federal Action.

On June 25, 2014, the federal court granted AngioScore's motion to amend in large part. On July 15, 2014, AngioScore filed an amended pleading in which it alleged that Konstantino had breached his fiduciary duties to AngioScore by usurping a corporate opportunity of AngioScore when he created the Chocolate device for the benefit of TriReme, Quattro and QT. AngioScore also added claims against TriReme, Quattro and

---

[3] Enerio Aff. (Nov. 7, 2014) Ex. G (Reorganization Agreement) § 3. The "Schedule" referred to in the Reorganization Agreement is not in the record.

QT for aiding and abetting Konstantino's breach of fiduciary duty, and against all defendants (Konstantino, TriReme, Quattro and QT) for engaging in unfair competition in violation of the California Business and Professions Code for depriving AngioScore of a corporate opportunity.[4] TriReme Singapore was not named as a party to the Federal Action.

### D. Konstantino Sues for Advancement in Delaware

On May 21, 2014, Konstantino filed his complaint in this Court seeking advancement from AngioScore to defend against the state law claims asserted against him in the Federal Action and in the California state court action. Konstantino sought advancement under AngioScore's Bylaws and an indemnification agreement between Konstantino and AngioScore dated March 1, 2003 (the "AngioScore Agreement").

On June 4, 2014, AngioScore filed a counterclaim and third-party complaint, which named TriReme, Quattro and QT as third-party defendants. That pleading sought, among other things, a declaratory judgment that "if and to the extent advancement rights are provided to [Konstantino] by AngioScore, then Third-Party Defendants should be required to contribute to the advancement of expenses to [Konstantino] in connection with the Federal Action . . . ."[5]

On August 6, 2014, after expedited briefing and oral argument, I granted Konstantino's motion for summary judgment on his advancement claims against

---

[4] *See* Am. Third-Party Compl. Ex. 6.

[5] *Id.* ¶ 34.

AngioScore in a bench ruling. The core rationale for that ruling was that Konstantino had been made a party to the Federal Action with respect to the state law claims by reason of his service as a director of AngioScore, thereby triggering his rights to advancement under AngioScore's Bylaws and the AngioScore Agreement.[6] In that ruling, I also stayed discovery as to TriReme, Quattro and QT, except to require that they produce "any documents that reflect an actual undertaking of a legal obligation to advance or indemnify [Konstantino] in any capacity."[7]

### E.    The TriReme and QT Indemnification Agreements

The present motion implicates mandatory rights of advancement found in three agreements, which are sometimes referred to below, collectively, as the "Third-Party Agreements." The first agreement is an indemnification agreement between TriReme Medical, Inc. (the predecessor to TriReme) and Konstantino dated June 21, 2005 (the "2005 TriReme Agreement"). This agreement mandates advancement if Konstantino becomes "a party to or witness or other participant in" a proceeding by reason of" one of three circumstances:

> by reason of (or arising in part out of) any event or occurrence related to the fact that [Konstantino] [1] is or was a director, officer, employee, agent or fiduciary of [TriReme], or any subsidiary of [TriReme], or [2] is or was serving at the request of [TriReme] as a director, officer, employee, agent or fiduciary of another corporation, partnership, joint venture, trust or other enterprise, or [3] by reason of any action or inaction on the part of [Konstantino] while serving in such capacity . . . .[8]

---

[6] Tr. of Oral Arg. 106-09 (Aug. 6, 2014).

[7] Order (Aug. 13, 2014) at ¶ 1.

[8] Enerio Aff. (Nov. 7, 2014) Ex. C (2005 TriReme Agreement) §§ 1(a), 2.

The 2005 TriReme Agreement is governed by Delaware law, contains a forum selection clause providing that the Delaware Court of Chancery shall be the exclusive forum to adjudicate any claim arising out of the agreement, contains an express consent to jurisdiction in Delaware for this purpose, and provides that the agreement shall bind successors and assigns, including "by purchase, merger, consolidation or otherwise to all or substantially all of the business and/or assets of the Company."[9]

The other two agreements at issue were approved by the board of QT, TriReme's parent company, on November 10, 2014, while this action was pending, but were not signed until January 26, 2015.[10] The first of these two agreements is between TriReme Medical, LLC and Konstantino, and is "dated effective as of July 11, 2013" (the "2013 TriReme Agreement"). The second is between QT Vascular Ltd. and Konstantino, and is "dated effective as of March 13, 2013" (the "QT Agreement").

Except for the fact that the advancement rights in the 2013 TriReme Agreement do not extend to Konstantino's service as an employee or agent of TriReme, the advancement rights under that agreement are similar to those in the 2005 TriReme Agreement. Specifically, the 2013 TriReme Agreement mandates advancement if Konstantino becomes involved in a proceeding "as a party, a potential party, a non-party witness or otherwise by reason of" one of three triggering events, which, in substance, mirror the three triggering events in the 2005 TriReme Agreement:

---

[9] *Id.* §§ 12, 15.

[10] Letter from Patricia L. Enerio (Aug. 11, 2015).

by reason of (i) the fact that [Konstantino] is or was a director or officer of [TriReme], (ii) any action taken by [Konstantino] or any action or inaction on [Konstantino's] part while acting as a director or officer of [TriReme], or (iii) the fact that he or she is or was serving at the request of [TriReme] as a director, trustee, general partner, managing member, officer, employee, agent or fiduciary of [TriReme] or any other Enterprise . . . .[11]

Also similar to the 2005 TriReme Agreement, the 2013 TriReme Agreement is governed by Delaware law, contains a forum selection clause providing that the Delaware Court of Chancery shall be the exclusive forum to adjudicate any claim arising out of the agreement, contains an express consent to jurisdiction in Delaware for this purpose, and provides that the agreement shall bind successors and assigns, including "by purchase, merger, consolidation or otherwise to all or substantially all of the business or assets of the Company."[12]

The scope of advancement rights afforded under the QT Agreement is the same as under the 2013 TriReme Agreement, with the obligations running to QT instead of TriReme.[13] The QT Agreement, however, is "governed by . . . the laws of Singapore" and provides that "any action or proceeding arising out of or in connection with [it] shall be brought only in the Singapore courts, and not in any other state or federal court or in any court in any other country . . . ."[14]

---

[11] Letter from Patricia L. Enerio (June 4, 2015) Ex. 2 (2013 TriReme Agreement) § 1(g).

[12] *Id.* §§ 20, 26.

[13] Letter from Patricia L. Enerio (June 4, 2015) Ex. 3 (QT Agreement) § 8.

[14] *Id.* § 26.

In addition to the Third-Party Agreements, Konstantino is a party to a Service Agreement dated April 16, 2014 (the "Service Agreement") along with TriReme and QT. The Service Agreement provides that QT shall employ Konstantino and that he "shall serve the group comprising [QT, TriReme, TriReme Singapore] and Quattro (collectively, *Group* or *Group Companies*) as Chief Executive Officer of the Group . . . ."[15] The Service Agreement further provides that "[n]one of the provisions of this Agreement shall be deemed to constitute a partnership or joint venture between the parties for any purpose."[16] The Service Agreement does not contain any provisions providing for advancement to or indemnification of Konstantino.

### F. The Ruling on the State Law Claims in the Federal Action

On July 1, 2015, following a six-day bench trial, the federal court issued a decision ruling in favor of AngioScore and against Konstantino, TriReme, Quattro, and QT on the state law claims that were added to the case in 2014. Specifically, the court ruled that, "[a]s a member of AngioScore's board of directors, Konstantino breached his fiduciary duty to AngioScore and usurped a corporate opportunity when he developed Chocolate for his own benefit and failed to offer the opportunity to AngioScore."[17] The federal court also found that TriReme and Quattro aided and abetted this breach,[18] that

---

[15] Enerio Aff. (Nov. 7, 2014) Ex. J (Service Agreement) § 1 (emphasis in original).

[16] *Id.* § 13.

[17] *AngioScore, Inc.*, 2015 WL 4040388, at *7.

[18] *Id.* at *20-23.

9

QT "is liable as a successor in interest to the liabilities of Quattro and TriReme,"[19] and that all defendants had violated California's unfair competition law.[20]

The federal court awarded AngioScore damages of $20.034 million for its past and future lost profits, and ordered Konstantino to disgorge any benefits obtained as a result of his breaches.[21] The patent infringement claims were not litigated during the bench trial and remain to be adjudicated.

### G.    Procedural History

On September 4, 2014, AngioScore filed its Amended Third-Party Complaint, adding TriReme Singapore as a third-party defendant, and adding as a new third-party defendant "the Group," which AngioScore alleges is a *de facto* partnership based on the Third-Party Defendants' references to the "Group" in certain documents and public releases, and "the co-mingling of assets and interrelated activities of the members of the Group . . . ."[22] The Amended Third-Party Complaint contains five claims:

- Count I seeks declaratory relief against Konstantino for failing to comply with a subrogation provision in the AngioScore Agreement.

- Count II seeks injunctive relief against Konstantino relating to his failure to do all actions that may be necessary to secure his rights to advancement from the Third-Party Defendants.

---

[19] *Id.* at *23-26.

[20] *Id.* at *26-27.

[21] *Id.* at *35.

[22] Am. Third-Party Compl. ¶ 44.

- Count III seeks declaratory relief against the Third-Party Defendants and the Group that they "should be required to contribute to the advancement of expenses to [Konstantino] in connection with the Federal Action, each in an amount at least equal to or greater than any such payment made by AngioScore."[23]

- Count IV seeks contribution from the Third-Party Defendants and the Group "to any advancement of expenses to [Konstantino] in connection with the Federal Action, in an amount at least equal to or greater than any such payments made by AngioScore."[24]

- Count V alleges that the Third-Party Defendants and/or the Group tortiously interfered with Konstantino's performance of his obligations under the AngioScore Agreement by, among other things, "withholding information within [Konstantino's] control that [Konstantino] is obligated to provide to AngioScore and failing to cause TriReme, TriReme Singapore, Quatro, QT and/or the 'Group' to adequately contribute to [Konstantino's] advancement or expenses."[25]

On September 18, 2014, the Third-Party Defendants filed a motion to dismiss. The Singapore entities moved for dismissal under Court of Chancery Rules 12(b)(2), 12(b)(4) and 12(b)(5) for lack of personal jurisdiction, insufficiency of process, and insufficiency of service of process. All Third-Party Defendants moved to dismiss the claims against them (Counts III-V) under Court of Chancery Rule 12(b)(6) for failure to state a claim for relief.

After briefing on the motion had been completed on March 16, 2015, the parties submitted letters to the Court regarding two developments. On June 4, 2015, the Third-

---

[23] Am. Third-Party Compl. ¶ 66.

[24] *Id.* ¶ 69.

[25] *Id.* ¶ 74.

11

Party Defendants informed the Court about the existence of the 2013 TriReme Agreement and the QT Agreement, which had only been produced to AngioScore in April 2015. On July 13, 2015, counsel for AngioScore provided a copy of the July 1, 2015 ruling in the Federal Action, along with additional analysis concerning the impact of that decision and the two recently discovered indemnification agreements on the pending motion.

Oral argument was held on July 27, 2015. During argument, counsel for the Third-Party Defendants acknowledged that they had received actual notice of the claims asserted against them in this action, and clarified that they were not pressing their defenses for insufficiency of process under Rule 12(b)(4) or insufficiency of service of process under Rule 12(b)(5), electing to rely instead on their argument that personal jurisdiction had not been established over the Singapore entities.[26]

## II.    LEGAL ANALYSIS

What remains of the Third-Party Defendants' motion breaks into two issues: (1) whether the three Singapore entities are subject to personal jurisdiction in Delaware, and (2) whether Counts III-V of the Amended Third-Party Complaint state a claim for relief. I address each of these issues in turn.

---

[26] Tr. of Oral Arg. 31-32 (July 27, 2015).

## A. Personal Jurisdiction

"Generally, a plaintiff does not have the burden to plead in its complaint facts establishing a court's personal jurisdiction over defendant."[27] But "[w]hen a defendant moves to dismiss a complaint pursuant to Court of Chancery Rule 12(b)(2), the plaintiff bears the burden of showing a basis for the court's exercise of jurisdiction over the defendant."[28] "In ruling on a Rule 12(b)(2) motion, the court may consider the pleadings, affidavits, and any discovery of record. If . . . no evidentiary hearing has been held, plaintiffs need only make a prima facie showing of personal jurisdiction and the record is construed in the light most favorable to the plaintiff."[29]

AngioScore asserts jurisdiction is proper as to TriReme Singapore, Quattro and QT under several theories. As to each of the Singapore entities, AngioScore asserts jurisdiction under the Delaware long-arm statute, 10 *Del. C.* § 3104, and the conspiracy theory of jurisdiction. AngioScore further asserts that TriReme Singapore has consented to jurisdiction in Delaware by assuming the advancement obligations owed by TriReme, and that QT, as the manager of TriReme, a Delaware limited liability company, is subject to jurisdiction under 6 *Del. C.* § 18-109(a). Because I find that AngioScore has made a *prima facie* showing to establish personal jurisdiction over each of the Singapore entities under the conspiracy theory, I do not address its other jurisdictional theories.

---

[27] *Benerofe v. Cha*, 1996 WL 535405, at *3 (Del. Ch. Sept. 12, 1996).

[28] *Ryan v. Gifford*, 935 A.2d 258, 265 (Del. Ch. 2007).

[29] *Id.* (footnotes and quotation marks omitted).

13

The conspiracy theory of jurisdiction "is based on the legal principle that one conspirator's acts are attributable to the other conspirators."[30] Thus, "if the purposeful act or acts of one conspirator are of a nature and quality that would subject the actor to the jurisdiction of the court, all of the conspirators are subject to the jurisdiction of the court."[31] The conspiracy theory is not an independent basis for jurisdiction, but rather an alternative way to satisfy the requirements of the long-arm statute, 10 *Del. C.* § 3104.[32]

As the Delaware Supreme Court explained in *Instituto Bancario*, the conspiracy theory of jurisdiction requires the satisfaction of a five-part test:

> a conspirator who is absent from the forum state is subject to the jurisdiction of the court, assuming he is properly served under state law, if the plaintiff can make a factual showing that: (1) a conspiracy to defraud existed; (2) the defendant was a member of that conspiracy; (3) a substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state; (4) the defendant knew or had reason to know of the act in the forum state or that acts outside the forum state would have an effect in the forum state; and (5) the act in, or effect on, the forum state was a direct and foreseeable result of the conduct in furtherance of the conspiracy.[33]

Recently, in *Virtus Capital*, this Court explained the relationship between this five-part test and the two-prong test to establish jurisdiction under the Delaware long-arm

---

[30] *Matthew v. Fläkt Woods Gp. SA*, 56 A.3d 1023, 1027 (Del. 2012).

[31] *Instituto Bancario Italiano SpA v. Hunter Eng'g Co.*, 449 A.2d 210, 222 (Del. 1982).

[32] *Virtus Capital L.P. v. Eastman Chemical Company*, 2015 WL 580553 at *12 (Del. Ch. Feb. 11, 2015).

[33] 449 A.2d at 225.

statute—which requires demonstrating both a statutorily defined nexus to the State, as well as compliance with constitutional notions of due process—as follows:

> the five elements of the *Instituto Bancario* test functionally encompass both prongs of the jurisdictional test. The first three *Instituto Bancario* elements address the statutory prong of the test. The fourth and fifth *Instituto Bancario* elements address the constitutional prong of the test. . . . Therefore, if a plaintiff can address satisfactorily all five elements of the conspiracy theory, then the plaintiff will have met both prongs of the jurisdictional test.[34]

### 1. The Conspiracy Among the Third-Party Defendants

The first and second elements of the *Instituto Bancario* test ask whether a conspiracy existed and whether the defendants were members of the conspiracy. Although the first element of the test specifically mentions "a conspiracy to defraud," the test is not limited to that particular tort, and has been found to apply to claims for breach of fiduciary duty and aiding and abetting.[35] The existence of a conspiracy is tested by reference to an additional five elements: "(1) two or more persons; (2) some object to be accomplished; (3) a meeting of the minds between or among such persons relating to the object or a course of action; (4) one or more unlawful acts; and (5) resulting proximate damages."[36]

---

[34] 2015 WL 580553, at *13.

[35] *See Virtus Capital*, 2015 WL 580553, at *13; *Carsanaro v. Bloodhound Techs., Inc.*, 56 A.3d 618, 635-36 (Del. Ch. 2013) (noting that theory encompasses claims of breach of fiduciary duty and aiding and abetting); *Hamilton P'rs v. Englard*, 11 A.3d 1180, 1197 (Del. Ch. 2010) (same); *Crescent/Mach I P'rs, L.P. v. Turner*, 846 A.2d 963, 977 (Del. Ch. 2000) (rejecting construction of *Istituto Bancario* that would require a "specific allegation that [the defendants] agreed to conspire 'to defraud' minority stockholders").

[36] *Hartsel v. Vanguard Grp., Inc.*, 2011 WL 2421003, at *10 (Del. Ch. June 15, 2011).

Although events in this case have evolved since the Amended Third-Party Complaint was filed over one year ago, the conspiracy that fairly can be gleaned from the record is that the Third-Party Defendants together implemented a plan to make and sell the Chocolate device for their benefit knowing that Konstantino had usurped a corporate opportunity of AngioScore in creating the device. The alleged conspiracy began in 2009 when Konstantino, while serving as a fiduciary of AngioScore, worked with employees of the predecessors of TriReme (TriReme Medical, Inc.) and Quattro (Proteus) to conceive and develop the Chocolate device, and evolved to include each of the Singapore entities as they were formed and organized into a coordinated corporate structure for, among other purposes, promoting the sale of the Chocolate device in the United States. Evidence of each of the five elements referenced above to test the existence of such a conspiracy is present in record.

The current corporate structure through which the conspiracy has been implemented was established in 2013 as a result of the reorganization reflected in the Reorganization Agreement. According to Momi Brosh, the general manager of QT, Quattro serves as the research and development company, TriReme Singapore builds the products, TriReme distributes the products, and QT serves as a holding company.[37] QT's public statements demonstrate that the Third-Party Defendants have held themselves out since the 2013 reorganization as a single unified operation. For example, QT has issued numerous public releases referring to QT and its subsidiaries as "the Group" and to

---

[37] Brosh Dep. 15:23-16:5, 138:23-25.

Konstantino as CEO of "the Group,"[38] referring to "the commercialization of [the] Chocolate Touch" device as "another major milestone for the Group,"[39] and describing revenue growth for QT due to "[QT's] US distribution agreement with Cordis"[40]—even though that agreement actually was signed by its Delaware subsidiary, TriReme.[41] Although these allegations do not necessarily support the existence of "the Group" as a legally cognizable partnership, they provide *prima facie* evidence of a meeting of the minds among the four Third-Party Defendants for the unified purpose of making and selling the Chocolate device.

The final two elements of the test for finding a conspiracy—one or more unlawful acts, and resulting damages—are substantiated by findings in the Federal Action that TriReme and Quattro aided and abetted Konstantino's breach of fiduciary duty. Regarding TriReme, the federal court found that "TriReme knew Konstantino's conduct constituted a breach of duty and gave substantial assistance or encouragement for Konstantino to persist in his breach."[42]  As the federal court explained:

> First, the record is replete with evidence that TriReme employees provided substantial assistance to Konstantino at every step of the design and modeling process for Chocolate.  While Konstantino remained on

---

[38] *See e.g.* Am. Third-Party Compl. Exs. 12, 13; Bloom Aff. (Jan. 22, 2015) Exs. 9, 10, 11, 12, 16, 17, 18.

[39] Bloom Aff. (Jan. 22, 2015) Ex. 18.

[40] Am. Third-Party Compl. Ex. 13 (emphasis added).

[41] Bloom Aff. (Jan. 22, 2015) Ex. 5.

[42] *AngioScore, Inc.*, 2015 WL 4040388, at *21.

AngioScore's board of directors, TriReme engineers helped him develop and build the Chocolate device. . . . Not only did TriReme employees design and test the Chocolate idea prior to the time Konstantino left AngioScore's board, they did so under his general supervision. Konstantino, as TriReme's CEO, was on emails contributing to the discussion. TriReme's HR and Marketing Manager provided critical support on Konstantino's efforts by applying for funding for a grant from the Singaporean government.

Second, the Court finds that based on the evidence of record, TriReme employees and management knew that Konstantino was on AngioScore's board while such work was undertaken. The conclusion is all but inescapable that they knew Konstantino's work on Chocolate constituted a violation of his fiduciary duties as a board member. Throughout the later part of 2009 and early into 2010, TriReme employees, as well as Konstantino, knew well—indeed, *intended*—that Chocolate would compete with AngioScore, and that Konstantino remained on AngioScore's board of directors.[43]

Regarding Quattro and its predecessor entity (Proteus), the federal court found that "Proteus/Quattro was inextricably involved in, and had actual knowledge of, Konstantino's breach. Indeed, it was formed with the specific purpose of furthering that breach."[44] As the federal court further explained:

Konstantino, as Proteus's Chairman and Quattro's Director, formed the organization for purposes of raising funds for Chocolate, which included seeking funding from the Singaporean government, and later, used Quattro as the corporate entity to hold intellectual property rights in Chocolate.[45]

The harm to AngioScore resulting from the unlawful acts found in the Federal Action is significant. The federal court awarded AngioScore over $20 million in

---

[43] *Id.*

[44] *Id.* at *23.

[45] *Id.*

damages, plus disgorgement of profits, for Konstantino's breach of fiduciary duty and related claims.[46] Based on the foregoing, I find that the first two prongs of the *Instituto Bancario* test—(1) the existence of a conspiracy (2) in which all Third-Party Defendants were members—are satisfied.[47]

### 2. The Acts in Delaware

The third element of the *Instituto Bancario* test asks whether a substantial act or substantial effect in furtherance of the conspiracy occurred in Delaware. The test does not require that such act be performed by any specific defendant; instead, "one conspirator's acts are attributable to the other conspirators."[48] AngioScore alleges here that the Third-Party Defendants have engaged in significant efforts to sell the Chocolate device to medical facilities located in Delaware, specifically, to the Christiana Care

---

[46] *Id.* at *35.

[47] The Third-Party Defendants argue that jurisdiction is inappropriate as to parent QT because "an attempt to apply a conspiracy theory to parent-subsidiary corporations in order to extend the reach of Section 3104 raises particular concerns" because a "controlling shareholder does by definition control (or have the power to control) the acts of its subsidiary." Op. Br. 32 (quoting *Red Sail Easter Ltd. Partners, L.P. v. Radio City Music Hall Productions, Inc.*, 1991 WL 129174, at *4 (Del. Ch. July 10, 1991)). The concerns expressed in *Red Sail* are inapplicable here, however, because QT, like each of the other Third-Party Defendants, played its own individual role in the alleged conspiracy. It is an independent conspirator, and is not subject to jurisdiction merely by nature of the acts of its subsidiary.

[48] *Instituto Bancario*, 449 A.2d at 222; *accord Fläkt Woods*, 56 A.3d at 1027, *Virtus Capital*, 2015 WL 580553 at * 13.

Health System, Delaware's largest healthcare provider, and the Nanticoke Memorial Hospital.[49]

The Third-Party Defendants' sales efforts in Delaware are documented in an affidavit from Tom Canavan, a Senior Territory Manager of Spectranetics, AngioScore's parent company, for the region that includes Delaware. He attests to having personally observed the Chocolate device in those hospitals and to having encountered representatives of TriReme and its distributor (Cordis) seeking to sell or distribute TriReme products, including the Chocolate device, in those hospitals "on numerous occasions."[50] Canavan estimated that "approximately three to four 'Chocolate' devices are sold per week to Nanticoke and about five to ten 'Chocolate' devices are sold per week to Christiana,"[51] and stated that he "believe[s] Christiana to be one of TriReme's biggest hospital accounts."[52] Canavan also attested that TriReme hired a dedicated

---

[49] AngioScore argues that a second Delaware-related activity taken in furtherance of the conspiracy was the conversion of TriReme Medical, Inc., a Delaware corporation, into TriReme Medical, LLC, a Delaware limited liability company, as part of the 2013 reorganization. Forming a Delaware entity to facilitate a challenged transaction, and filing a corporate instrument in Delaware in connection with a challenged transaction, have been found sufficient on numerous occasions to establish the required physical nexus to assert jurisdiction over non-residents, particularly where the challenged transaction is the subject of the asserted claims. *See Virtus Capital*, 2015 WL 580553, at *14, nn.2-3 (internal citations omitted). Here, the act of converting TriReme Medical, Inc. into a Delaware limited liability company is far more attenuated from the conspiracy alleged (*i.e.*, to make and sell a device that was the product of a fiduciary breach) than the efforts to sell the product in Delaware discussed above.

[50] Canavan Aff. (Jan. 16, 2015) ¶¶ 4-12.

[51] *Id.* at ¶ 5.

[52] *Id.* at ¶ 11.

salesman to market its products, including the Chocolate device, to hospitals in Delaware, beginning in fall 2013 and continuing up through the time of his affidavit in January 2015.[53] These efforts appear to have been successful: Canavan observed "a dramatic improvement over how [TriReme] was doing prior to hiring [the salesman]," and "greater market penetration with Nanticoke."[54]

In my view, these acts in Delaware were taken in furtherance of the alleged conspiracy. This Court's decision in *Haisfield v. Cruver*[55] is instructive. In *Haisfield*, directors of Unisil, Inc. were alleged to have breached their fiduciary duties to Unisil by usurping a corporate opportunity to develop and manufacture storage tanks for EcoVault, a Virginia corporation. Two of the Unisil directors also were directors and principal stockholders of EcoVault. EcoVault moved to dismiss for lack of personal jurisdiction, contending that even if it could be proven that it sold EcoVault products in Delaware, that conduct was not sufficiently connected with the underlying alleged breach of fiduciary duty to support finding personal jurisdiction in Delaware over a non-resident under the Delaware long-arm statute. The *Haisfield* court rejected the argument, holding that because "Plaintiff's claims focus on the usurpation of the corporate opportunity to design, develop, market, distribute and sell above-ground storage tanks—a business opportunity allegedly cultivated with Unisil assets," then "[t]he sale of even one tank in Delaware

---

[53] *Id.* at ¶¶ 7-10.

[54] *Id.* at ¶ 8.

[55] 1994 WL 497868 (Del. Ch. Aug. 25, 1994).

21

constituted an actual event evidencing the consummation of the plaintiff's usurpation of a corporate opportunity theory."[56]

Although the *Haisfield* court undertook this analysis for the purpose of determining whether the claim against EcoVault "arises from" from any of the acts enumerated in Section 3104(c) of the Delaware long-arm statute, I find its logic to be persuasive in the conspiracy context as well. As discussed above, the conspiracy alleged here involved the implementation of a plan by the Third-Party Defendants to make and sell the Chocolate device knowing that its creation was the product of a breach of duty by Konstantino in his role as a fiduciary of AngioScore—specifically, that Konstantino had usurped a corporate opportunity of AngioScore when he created the device. Thus, similar to *Haisfield*, sales of the Chocolate device in Delaware constitute acts representing the consummation of the usurpation of the corporate opportunity.

### 3. Knowledge of the Acts in Delaware

The fourth and fifth elements of the *Instituto Bancario* test evaluate whether "the defendant knew or had reason to know of the act in the forum state" and whether such act "was a direct and foreseeable result of the conduct in furtherance of the conspiracy."[57] These elements require allegations "from which one can infer that a foreign defendant

---

[56] *Id.* at *4.

[57] 449 A.2d at 225.

knew or should have known that the conspiracy would have a Delaware nexus."[58] These elements are plainly met here.

Konstantino is the CEO of the Group consisting of the four Third-Party Defendants: QT, TriReme, TriReme Singapore, and Quattro. It not disputed (nor could it be) that Konstantino was aware of the efforts to sell the Chocolate device in Delaware. This knowledge is thus fairly imputed to each of the Third-Party Defendants. As then-Vice Chancellor Strine held in the *AIG* case, "[w]hen a corporation empowers managers with the discretion to handle certain matters and to deal with third parties, the corporation is charged with the knowledge of those managers when the corporation is sued by innocent parties."[59] Given, furthermore, that a central purpose of the alleged conspiracy was to sell the Chocolate device in the United States, using Cordis as a distributor, it was entirely foreseeable that the Third-Party Defendants' sales efforts would include the State of Delaware. Accordingly, the fourth and fifth elements of the *Instituto Bancario* test have been satisfied.

Finally, this Court's exercise of personal jurisdiction over the Singapore entities comports with due process. Because the Singapore entities voluntarily participated in a

---

[58] *Fläkt Woods*, 56 A.3d at 1024.

[59] *In re Am. Intern. Group, Inc., Consol. Derivative Litig.*, 976 A.2d 872, 887 (Del. Ch. 2009); *see also* 3 William Meade Fletcher, Cyclopedia of the Law of Corporations § 790 ("[T]he general rule is well established that a corporation is charged with constructive knowledge . . . of all material facts of which its officer or agent receives notice or acquires knowledge while acting in the course of employment within the scope of his or her authority, even though the officer or agent does not in fact communicate the knowledge to the corporation.").

23

conspiracy to sell the Chocolate device knowing that its creation was the product of a breach of duty Konstantino owed to AngioScore, a Delaware corporation, it is fair and reasonable in my view to require them to defend the contribution claims here, in the forum where Konstantino chose to adjudicate his claims for advancement from AngioScore in the first place. Put differently, by any reasonable measure, the Singapore entities should have anticipated that their involvement in a concerted plan to sell a device in this jurisdiction, that they knew had been usurped from a Delaware corporation by one of that corporation's fiduciaries, might well result in this State asserting jurisdiction over them to account for their role in that breach of duty and the related advancement issues that almost inevitably arise out of such litigation.

* * * * *

For the reasons explained above, I conclude that AngioScore has made a *prima facie* showing that all of the *Instituto Bancario* factors are met and thus that this Court has personal jurisdiction over the Singapore entities under the conspiracy theory of jurisdiction.

## B.    Failure to State a Claim for Relief

The standard of review on a motion to dismiss under Court of Chancery Rule 12(b)(6) for failure to state a claim is well-established: the motion must be denied "unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances."[60] The court "should accept all well-pleaded factual allegations in

---

[60] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 27 A.3d 531, 536 (Del. 2011); *see also Winshall v. Viacom Int'l., Inc.*, 76 A.3d 808, 813 n.12 (Del. 2013).

the Complaint as true, accept even vague allegations in the Complaint as 'well-pleaded' if they provide the defendant notice of the claim, [and] draw all reasonable inferences in favor of the plaintiff."[61]

### 1. Contribution Claims

Count III of the Amended Third-Party Complaint seeks a declaration that the Third-Party Defendants and the Group "should be required to contribute to the advancement of expenses to [Konstantino] in connection with the Federal Action, each in an amount at least equal to or greater than any such payment made by AngioScore."[62] Count IV seeks contribution from the Third-Party Defendants and the Group "to any advancement of expenses to [Konstantino] in connection with the Federal Action" for the same amount.[63] Given their overlap, Counts III and IV will be considered together.

In *Chamison v. HealthTrust, Inc.*, this Court held that "[t]o seek contribution from another insurer, the one seeking contribution must show that the other insurer's liability is concurrent, benefits the same insured, and insures the same risk."[64] Eight years later, in *Levy v. HLI Operating Co., Inc.*, this Court further explained the equitable right of contribution as follows:

---

[61] *Cent. Mortg. Co.*, 27 A.3d at 536.

[62] Am. Third-Party Compl. ¶ 66.

[63] *Id.* ¶ 69.

[64] *Chamison v. HealthTrust, Inc.*, 735 A.2d 912, 926 (Del. Ch. 1999), *aff'd*, 748 A.2d 407 (Del. 2000).

25

An equitable right of contribution arises when one of several obligors liable on a common debt discharges all, or greater than its share, of the joint obligation for the benefit of all the obligors. To succeed on a contribution claim, a party must show concurrent obligations existed to the same entities, and that the obligors essentially insured the same interests and the same risks.[65]

Although *Chamison* and *Levy* involved disputes over indemnification, this Court has cited those decisions with favor in resolving allocation disputes over competing sources of advancement,[66] and, in my opinion, the test articulated in those decisions provides a logical framework for addressing such a dispute.

The Third-Party Defendants agree that the *Chamison* test for contribution applies here, and make no argument that the first two elements of the test (*i.e.*, concurrent obligations benefiting the same insured) have been satisfied. Their opposition is based solely on the argument that "the Third-Party Defendants and AngioScore do not insure the 'same risk.'"[67] The premise of this argument is that Konstantino was sued for breaching a duty in his capacity as a fiduciary *of AngioScore*, and thus the Third-Party Agreements "do not insure the same activity that is at issue in the Federal Action."[68]

---

[65] *Levy v. HLI Operating Co., Inc.*, 924 A.2d 210, 220 (Del. Ch. 2007).

[66] *See, e.g., Sodano v. American Stock Exchange LLC*, 2008 WL 2738583, at *16, n. 84 (Del. Ch. Apr. 25, 2008) ("*Chamison* makes clear that a co-indemnitor who pays more than its fair share has a right to seek contribution from its fellow co-indemnitor.") (*Chamison* found not to apply because one of two sources of advancement reflected a "hierarchical intent" to be only a secondary source of advancement, and therefore contribution was not the appropriate theory of recovery).

[67] Op. Br. 45.

[68] *Id.*

In opposition, AngioScore contends that the only relevant question before the Court is whether any of the Third-Party Agreements would provide any coverage for Konstantino's defense of the Federal Action. In essence, this is the flip-side of the Third-Party Defendants' position—that is, if the Third-Party Agreements would provide such coverage, they necessarily insure the "same risk." In making this argument, AngioScore emphasizes the dual roles Konstantino was playing when he usurped the corporate opportunity of the Chocolate device, specifically, that Konstantino oversaw the development of the device while serving as fiduciary *of TriReme and Quattro* (as well as a fiduciary of AngioScore) and made the device *to benefit TriReme and Quattro* and, ultimately, the Group as a whole. In my opinion, AngioScore has the better of this argument.

As discussed above, each of the Third-Party Agreements provides, in substance, similar rights to advancement for directors and officers of the relevant entity. Using the 2013 TriReme Agreement to illustrate, Konstantino has a mandatory right to advancement if he becomes involved in a proceeding "as a party, a potential party, a non-party witness or otherwise by reason of the fact" of one of three circumstances:

> by reason of (i) the fact that [Konstantino] is or was a director or officer of [TriReme], (ii) any action taken by [Konstantino] or any action or inaction on [Konstantino's] part while acting as a director or officer of [TriReme], or (iii) the fact that he or she is or was serving at the request of [TriReme] as a director, trustee, general partner, managing member, officer, employee, agent or fiduciary of [TriReme] or any other Enterprise . . . .[69]

---

[69] Letter from Patricia L. Enerio (June 4, 2015) Ex. 2 (2013 TriReme Agreement) § 1(g).

In *Homestore, Inc. v. Tafeen*,[70] the Delaware Supreme Court explained that a proceeding for which advancement is sought is "by reason of the fact" that one is or was a director or officer "if there is a nexus or causal connection between" the underlying proceeding and "one's official corporate capacity." A causal connection exists "if the corporate powers were used or necessary for the commission of the alleged misconduct."[71]

It is plainly correct, as the Third-Party Defendants contend, that Konstantino was sued in the Federal Action by reason of his status as director of AngioScore. Specifically, Konstantino was sued (and ultimately found liable) for breaching a fiduciary duty he owed to AngioScore by usurping a corporate opportunity when he created the Chocolate device. This is the reason summary judgment was granted in Konstantino's favor earlier in this case requiring AngioScore to provide advancement to him under its Bylaws and the AngioScore Agreement. But that does not end the inquiry.

It is also true that, while he was serving as a director of AngioScore, Konstantino was serving simultaneously as a director and officer of TriReme and Quattro, in which capacities he oversaw the development of the Chocolate device to benefit *those* entities— not AngioScore. As noted above, the federal court made specific factual findings that Konstantino, as the CEO of TriReme, supervised TriReme employees who were

---

[70] 888 A.2d 204, 214 (Del. 2005).

[71] *Bernstein v. TractManager, Inc.*, 953 A.2d 1003, 1011 (Del. Ch. 2007).

28

designing and testing the Chocolate device, and raised funds to develop and make the Chocolate device as a director of Quattro.[72]

Given the dual roles Konstantino was serving when he worked on the development of the Chocolate device, it is reasonably conceivable in my view that AngioScore would be able to demonstrate the required nexus between the subject matter of the Federal Action and actions Konstantino took as a director and officer of TriReme and Quattro so as to trigger coverage under the Third-Party Agreements. Put in terms of the plain language of the 2013 TriReme Agreement, for example, a reasonable argument can be made that Konstantino was involved in the Federal Action both "by reason of the fact" that he was a director or officer of TriReme, and by reason of actions he took "while acting as a director or officer" of TriReme. The fact that the recovery in the Federal Action ultimately flowed from breaching a duty owed to AngioScore instead of TriReme or Quattro appears irrelevant. The advancement provisions in the 2013 TriReme Agreement do not condition coverage on requiring that Konstantino be made a party to a proceeding or necessarily be exposed to liability—it would be sufficient if he is involved even as "a non-party witness or otherwise."

For the reasons explained above, I conclude it is reasonably conceivable that two separate sources of advancement are available to Konstantino for the Federal Action, one from AngioScore and the other from the Third-Party Defendants. Thus, AngioScore has

---

[72] *AngioScore, Inc.*, 2015 WL 4040388, at *21, *23. I take judicial notice of the federal court's findings of fact for the purpose of considering the 12(b)(6) motion. *See* D.R.E. 201(b).

29

made a sufficient showing to demonstrate the existence of concurrent obligations benefiting the same insured and covering the same risk so as to state a claim for contribution. Accordingly, the motion to dismiss Counts III and IV is denied.

* * * * *

During briefing of the present motion, which occurred in a disjointed fashion over an extended period, the parties raised a host of sub-issues involving some complex questions that were unnecessary to resolve on this motion and would need more considered treatment if they become relevant in the future. For clarity, I outline some of those issues below.

First, I express no views concerning which entity ultimately may be responsible for the advancement obligations arising under any of the Third-Party Agreements. In opposing dismissal for lack of personal jurisdiction, AngioScore argued that TriReme Singapore assumed the obligations owed under the 2005 and 2013 TriReme Agreements by virtue of the fact that the Third-Party Defendants agreed in the Reorganization Agreement that TriReme Singapore would "undertake all liabilities of [TriReme] as [sic] 11 July 2013."[73] It is far from clear if this provision means that TriReme Singapore assumed all of TriReme's obligations under the 2005 and 2013 Agreements, as opposed, for example, to assuming liabilities that were on the books of TriReme as of the effective

---

[73] Enerio Aff. (Nov. 7, 2014) Ex. G (Reorganization Agreement) § 3. As noted above, although the 2013 TriReme Agreement was not executed until January 2015, it contains an effective date of July 11, 2013.

30

date of the Reorganization Agreement.[74]  In its July 1, 2015 decision, moreover, the federal court found that QT "is liable as a successor in interest to the liabilities of Quattro and TriReme" and that QT "assumed the assets and liabilities of TriReme or Quattro wholesale in the final transaction," apparently referring to the 2013 reorganization.[75]  All of these issues remain open for further litigation.

Second, as noted above, the QT Agreement contains a forum selection clause providing that "any action or proceeding arising out of or in connection with" that agreement shall be brought only in the Singapore courts.[76]  The parties have not addressed whether it would be unreasonable to enforce that provision in this case,[77] and I express no view on that subject.

Finally, Counts III and IV were asserted against each of the Third-Party Defendants individually and against the four of them as a unitary "Group" based on the notion that these four entities constitute a "*de facto* partnership."[78]  The parties have not

---

[74] The Third-Party Defendants also argued that the 2013 TriReme Agreement replaced the 2005 TriReme Agreement.  *See* Tr. of Oral Arg. 10 (July 27, 2015).  The record is incomplete on this issue and it would not be appropriate to resolve such a factual dispute on a motion to dismiss.

[75] *AngioScore, Inc.*, 2015 WL 4040388, at *23-26, Findings of Fact No. 190.

[76] Letter from Patricia L. Enerio (June 4, 2015) Ex. 3 (QT Agreement) § 26.

[77] *See generally M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1 (1972); *see also Ingres Corp. v. CA, Inc.*, 8 A.3d 1143, 1145-46 (Del. 2010) (adopting *Bremen* test in Delaware), *Boilermakers Local 154 Ret. Fund v. Chevron Corp.*, 73 A.3d 934, 954-62 (Del. Ch. 2013) (applying *Bremen* test for enforceability of forum selection bylaw).

[78] *See* Am. Third-Party Compl. ¶¶ 10, 40-44, 65-77.

adequately briefed whether a legitimate basis exists to disregard the separate corporate existence of these entities in order to treat them as singular entity, and I likewise express no views on that subject.

## 2. Tortious Interference

In Count V of the Amended Third-Party Complaint, AngioScore alleges that the Third-Party Defendants tortiously interfered with the performance of Konstantino's obligations under Section 12(g) of the AngioScore Agreement. That provision provides, in relevant part, that Konstantino "do all acts that may be necessary to secure" any rights of recovery Konstantino may have against other parties and "to enable [AngioScore] to effectively bring suit to enforce such rights."[79]

To demonstrate tortious interference with contractual relations, a plaintiff must demonstrate the following elements: "(1) a valid contract; (2) about which defendants knew; (3) an intentional act that is a significant factor in causing the breach of such contract; (4) without justification; (5) which causes injury."[80] To properly allege an intentional act, the plaintiff must allege facts demonstrating, or that at least raise a reasonable inference, that the defendant "knew an injury [was] certain or substantially certain to occur as a result of his action."[81] Consistent with the cursory treatment Count V received in its brief, AngioScore has failed to identify any well-pled facts in the

---

[79] Verified Complaint for Advancement Ex. C (AngioScore Agreement) § 12(g).

[80] *Beard Research, Inc. v. Kates*, 8 A.3d 573, 604 (Del. Ch. 2010) (citing *AeroGlobal Capital Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 437 n.7 (Del. 2005)).

[81] *UbiquiTel Inc. v. Sprint Corp.*, 2005 WL 3533697, at *6 (Del. Ch. Dec. 14, 2005).

Amended Third-Party Complaint sufficient to demonstrate an intentional act taken by any of the Third-Party Defendants that was a significant factor in causing a breach of the AngioScore Agreement. Thus, Count V is dismissed for failure to state a claim for relief.

The dismissal of Count V, however, is without prejudice. Good cause has been shown that it would not be just under the circumstances to dismiss Count V with prejudice at this time. As noted above, in an odd series of events, the Third-Party Defendants did not produce the 2013 TriReme Agreement and the QT Agreement to AngioScore until April 2015—despite the fact that those agreements apparently had been approved in November 2014 and signed in January 2015. All the while, AngioScore was advancing millions of dollars to Konstantino for his defense of the Federal Action. Under these circumstances, it would not be just to preclude AngioScore from seeking to replead a claim for tortious interference if it believes there is a legitimate basis for doing so once it has been afforded an opportunity to obtain discovery concerning these matters.

## III. CONCLUSION

For the reasons discussed above, the Third-Party Defendants' motion to dismiss the Singapore entities for lack of personal jurisdiction is denied, and their motion to dismiss Counts III-V of the Amended-Third-Party Complaint is denied as to Counts III and IV, and granted as to Count V, but without prejudice. In view of these rulings, the stay of discovery that was imposed on August 6, 2014, is hereby lifted.

**IT IS SO ORDERED**.

33